# United States Court of Appeals
## For the First Circuit

No. 24-1297

UNITED STATES OF AMERICA,

Appellee,

v.

JACOB PARLIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Montecalvo, Lynch, and Kayatta,
Circuit Judges.

Jonathan Mermin and Preti, Flaherty, Beliveau & Pachios, LLP
on brief for appellant.
Donald C. Lockhart, Assistant U.S. Attorney, and Joshua S.
Levy, U.S. Attorney, on brief for appellee.

March 11, 2026

KAYATTA, **Circuit Judge**.  Jacob Parlin was convicted by a jury of two drug counts charging him with distribution of and possession with intent to distribute certain quantities of methamphetamine and conspiracy to do the same.  His defense at trial was that he was a user but not a distributor.  On appeal, he argues first that the trial court erred by permitting a police officer to testify as a lay witness that the nearly two pounds of methamphetamine uncovered in his vehicle was inconsistent with personal use.  Second, he contends that, without the police officer's challenged testimony, the evidence was insufficient to show intent to distribute.  For the reasons that follow, we affirm Parlin's conviction on both counts.

## I.

Parlin came to the attention of authorities in early March 2021, when Drug Enforcement Administration (DEA) agents began wiretapping the phone of a man named Harry Tam, who was suspected of receiving narcotics including methamphetamine.  That wiretap captured phone calls between Tam, Parlin, and a third individual named Vincent Duong that seemed to discuss the transport and sale of narcotics.  On March 12, 2021, acting on captured calls between Tam and Duong, including one where Duong referred to receiving a "pound" for $3,500, officers pulled Duong over and seized two packages, each containing a little over two pounds of methamphetamine.

Two days later, on March 14, Tam called Parlin and bemoaned the loss of a "big deal," which was "discouraging" and made him want to "stop." Parlin urged Tam to continue, and Tam agreed, assuring him: "I'm invested with you." Parlin then updated Tam on a man named Steve, whom the two had discussed a week prior. On that earlier call, Parlin told Tam that Steve had "undermine[d]" and "undercut" Parlin "behind [his] back" with "[Parlin's] people way up there in Maine,"[1] but said he had "a plan" to deal with Steve and that Parlin and Tam could "fucking make some money." Tam responded that he would "hit [Parlin] with lower pricing." Later that same evening, Tam called Duong to tell him he had offered Parlin lower prices because Steve had "undercut [Parlin] behind his back to his customers," and Duong agreed they should "help [Parlin] out [to] get all his customers back." On March 14, Parlin updated Tam that, since their earlier conversation, he had gone "out there" to where Steve had "seen [Parlin's] people" and "[t]his dude [Steve] is exactly what you said . . . and it's all fucking cut."[2] Tam promised Parlin "[w]e

---

[1] A DEA agent testified at trial that, based on her training and experience, "Mr. Parlin was complaining to Mr. Tam that someone undercut . . . him in prices." On appeal, Parlin does not challenge the agent's interpretation or the admission of this testimony.

[2] A DEA-trained officer testified at trial that "cutting" a drug refers to "diluting the purity of it" with some other substance in order to "get more out of the product."

- 3 -

are going to have no cut stuff," and Parlin responded, "we can take over the whole game . . . up there, dude.  Just trust me." Tam agreed:  "I keep walking with you, you keep walking with me." The two then reminisced about how profitable things had been during the early stages of the COVID-19 pandemic, when "[p]olice were not trying to fuck with anybody."[3]

Two weeks later, at approximately 1:00 AM on March 31, 2021, New Hampshire police -- acting on a series of calls between Tam and Parlin[4] -- pulled Parlin over and discovered two heat-sealed bags of one hundred percent pure methamphetamine in his vehicle, weighing a total of 882.8 grams (nearly two pounds).  When Parlin exited the vehicle, a smaller, clear plastic bag containing a crystal-like substance fell out of his sweatshirt or pocket. Officers also found items consistent with drug use in Parlin's vehicle: a glass smoking pipe and bottle cap, both containing apparent drug residue; half of what appeared to be a methamphetamine pill; a syringe; and rolled dollar bills.

---

[3]  Tam recounted making $40,000 in the first three days. Parlin agreed that "it was nuts," recalling that "everybody got lock[ed] down" but he "just kept on moving":  "I was like fuck it, man.  I'm going to keep on doing this shit dude.  I didn't struggle at all."

[4]  Those calls culminated in Tam delivering a white plastic bag to Parlin's vehicle.  The two bags of methamphetamine later found in Parlin's vehicle were enclosed in a single white plastic bag.

On December 7, 2021, a federal grand jury indicted Parlin, Tam, Duong, and six others on various drug and firearm charges. Parlin was indicted on two counts: (1) conspiracy to distribute and to possess with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 846, and (2) distribution of and possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).[5]

As the case eventually went to trial, it turned on whether the government could prove beyond a reasonable doubt that the drugs Parlin possessed were for distribution. The government's first witness was Lieutenant Lindsey Cunningham, who oversaw the drug task force at the New Hampshire Rockingham County Sheriff's Office at the time of Parlin's arrest. Contending that Cunningham was actually an expert witness who had not been disclosed as such prior to trial, Parlin sought to preclude Cunningham from offering any testimony concerning how much methamphetamine users, as opposed to distributors, usually possessed.

The trial court told the government it needed to establish a foundation that showed "specifically how" Cunningham "know[s]" and has "learned in the course of his work" how much

---

[5] The indictment listed eleven counts; of those, Parlin was indicted on counts I and VI.

"meth users typically consume." At two separate subsequent sidebars, the court cautioned Cunningham, through the prosecutor and directly, that he could only testify from personal knowledge, meaning what "[he] ha[d] seen or . . . observed," not "what others ha[d] seen and told [him]."[6]

Cunningham testified that approximately a quarter of the roughly 100 drug cases he had worked were methamphetamine-related and that he worked with "cooperating sources" who had been arrested on drug charges. He testified he had personally seen how much methamphetamine those sources were arrested with and that "typically what you would see somebody have on their person would be a gram or two, maybe three at the most. That's user level." After confirming that he was speaking from personal knowledge, he testified that "I would typically see somebody with that much would be a street level user, just a normal, everyday user that would use multiple times a day to -- for the habit that they have." The court overruled Parlin's objections that this testimony was expert in nature and allowed Cunningham's testimony to stand. The jury was later instructed, over Parlin's objection, that "[i]ntent to

---

[6] The trial court otherwise allowed Cunningham to testify. The court stated that "just sort of seeing what people use from his experience, if he has a foundation for that, that doesn't strike me as . . . expert specialized knowledge testimony." Instead, the court found the testimony was "more in the vein of the kind of testimony that's just helpful to a jury, and that's admissible, without expert testimony or an expert disclosure[]."

distribute may . . . be inferred from a quantity of drugs larger than that needed for personal use," such that, "if you find that [Parlin] possessed a quantity of methamphetamine [that is] more than that which would be needed for personal use," the jury may, but need not, infer such an intent.

In addition to Lieutenant Cunningham's testimony, the government offered into evidence the recorded calls between Parlin, Tam, and Duong, as well as the nearly two pounds of methamphetamine seized from Parlin's vehicle. At the close of evidence, Parlin moved alternatively for a judgment of acquittal or for a mistrial, arguing again that Cunningham had offered undisclosed expert testimony. The trial court denied both motions, noting Cunningham's testimony was "cabined and narrowed" to his "personal knowledge and observations" and therefore not subject to expert disclosure. And the court pointed to other evidence supporting Parlin's intent to distribute, including but not limited to his statement that he was being "undercut" and Tam's statement that he was "invested in [Parlin]."

The jury convicted Parlin on both counts.

### III.

### A.

Parlin does not argue that the evidence admitted at trial was insufficient to support his conviction on either charge. Rather, he argues that the evidence would have been insufficient

to show the intent to distribute required for both charges had the trial court not admitted -- improperly in Parlin's view -- the opinion of Lieutenant Cunningham "about the quantity of methamphetamine that is associated with personal use generally." Appellant Br. 6.

But the law is clear that, in assessing the sufficiency of the evidence to support a verdict in a criminal case, we consider all the evidence admitted, without regard to whether the trial court's evidentiary rulings were correct.  United States v. Santiago-González, 825 F.3d 41, 46 (1st Cir. 2016).[7]  So, for that simple reason, Parlin's only challenge to the sufficiency of the evidence fails.[8]

---

[7]  The "logic behind this rule" is that a reversal for evidentiary insufficiency has "fundamentally different implications" than one for improperly admitted evidence.  United States v. Ramirez-Rivera, 800 F.3d 1, 16 n.10 (1st Cir. 2015) (second quoting Lockhart v. Nelson, 488 U.S. 33, 40 (1988)).  A reversal for evidentiary insufficiency "is in effect a finding that the government has failed to prove its case" and therefore bars retrial.  Lockhart, 488 U.S. at 40-42 (quotation marks omitted).  In contrast, a reversal for improperly admitted evidence shows a failure of process but "implies nothing with respect to the guilt or innocence of the defendant" and thus is no bar to retrial.  Id. at 39-40 (quotation marks omitted); see also United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002) (noting the remedy for a prejudicial evidentiary error is a new trial).

[8]  To add belt to suspenders, we note that at trial Parlin's counsel agreed that the evidence sufficed to get the case to the jury even without Cunningham's testimony on the amount of methamphetamine associated with personal use.

**B.**

Our ruling does not leave Parlin without any remedy if he was harmed by an incorrect evidentiary decision by the trial court. The erroneous admission of evidence requires a new trial unless the government shows it is "highly probable that the error[] did not influence the verdict." United States v. Sanabria, 645 F.3d 505, 516 (1st Cir. 2011) (quoting United States v. Meises, 645 F.3d 5, 23 (1st Cir. 2011)). It is only once the government meets this burden that an error is considered harmless and the verdict can stand. Id. As we will explain, however, we find that the admission of Lieutenant Cunningham's testimony about the quantity of methamphetamine associated with personal use to have been harmless -- more frosting than cake. So, we need not consider whether its admission was somehow improper.

Cunningham's testimony was harmless by any measure because the other evidence made it highly improbable that the jury would not have found as it did even without that testimony. The recorded phone conversations with Tam made it crystal clear that Parlin was in the business of selling methamphetamine. Those discussions concerned a pricing strategy in response to competitive pressures, impacts of the COVID pandemic on sales, profit opportunity, and supply sourcing. These are clearly not the concerns of a simple user looking for a hit. And any possible

remaining ambiguity regarding Parlin's role was plainly resolved by Tam and Duong's explicit references to Parlin's customers.

It is true that the prosecution touted Cunningham's testimony "that a normal . . . meth user[] uses one or two, maybe three grams a day." That touting certainly suggests that the prosecutor saw Cunningham's testimony as incriminating enough to warrant emphasis. But the fact remains that the recorded conversations alone rendered almost preposterous the suggestion that the roughly $7,000 worth of methamphetamine[9] Parlin was transporting was for his personal use. Nor was Cunningham's testimony the prosecution's sole focus. The government's closing also emphasized the value and sheer volume of the drugs ("enough for a casserole dish") and trained the jury's focus on the wiretapped phone calls. In short, the fact that the frosting was attractive does not mean that the cake itself was not filling.

**IV.**

We therefore hold that error, if any, in admitting Lieutenant Cunningham's testimony would have been harmless, and we <u>affirm</u> Parlin's conviction on both counts.

---

[9] The government arrived at this value based on the $3,500 Duong discussed paying for a single pound of methamphetamine in one of the wiretapped phone calls.